UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DAVID PARTON, | ) | |
| | ) | |
| | ) | Civil No. 6:22-cv-00018-GFVT |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| JOHNNY PARTON, *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

Mere months after a judgment was issued in *Henley Mining v. Parton*, four and a half years after that case was initiated, David Parton and Henley Mining are back in this Court. David is now suing Johnny and Timothy Parton in addition to Henley Mining for fraud, fraudulent transfer, and negligent misrepresentation. [R. 1.] These claims arise from four transfers of assets from Henley Mining to Johnny and Timothy surrounding the trial in the prior case. *Id.* The Plaintiff's Motion for Preliminary Injunction is presently before the Court. [R. 5; R. 6.] He asks the Court to enjoin the Defendants from disposing of the assets, which he alleges were transferred "to escape Plaintiff's collection efforts," in addition to various accounting and reporting requests. [R. 5.] For the following reasons, the Plaintiff's Motion for Preliminary Injunction [R. 5] is **GRANTED**.

**I**

Three brothers—David, Timothy, and Johnny Parton—were each one-third owners of a group of coal mining companies. [R. 1-8 at 4.] In 2016, David filed for dissolution of the companies after the brothers could not decide how to continue operations together. *Id.* at 5. That

action was dismissed upon a settlement that required: (1) the companies to merge into Henley

Mining, (2) David be paid the fair value of his one-third interest in the companies, and (3)

Henley Mining to deposit $450,000 in an escrow account and agree not to transfer or encumber

property in Tennessee valued at $136,500, to protect any potential judgment in David's favor.

*Id.* at 5-6.  Relevant to this action, it also required the company to formally transfer some

equipment to David via bill of sale.  *Id.* at 6.  Because the Parton Companies and Henley Mining

were S-corporations, Timothy and Johnny were each entitled to a distribution equal to the value

of the transferred equipment.  *Id.*  Instead of taking those distributions in cash, they were treated

as a liability on Henley Mining's books.  *Id.*  Those liabilities were initially valued at

$445,762.50.  *Id.* at 8.

The companies were merged into Henley Mining on January 31, 2017.  Timothy and

Johnny's expert valued the company at $446,427, so pursuant to the settlement, they paid David

one third of that value, $148,809.  *Id*.  David disagreed with the valuation and Henley Mining

filed suit against him in this Court to determine a fair valuation.  [R. 6 at 2; *Henley Mining v.

David Parton*, 6:17-00092-GFVT.]  The Court found the companies were worth $3,318,980 as of

the date of the merger.  [R. 1-8 at 15.]  David Parton therefore was awarded a judgment entitling

him to $957,517.67 (one third of the value of the companies, minus the prior $148,809 payment)

on November 15, 2021.  [*Id.*; R. 1-7.]

On January 23, 2022, David discovered four distributions of assets and equipment from

Henley Mining to Johnny and Timothy that occurred in late 2020.  [R. 1.]  The distribution

records state that they were in satisfaction of (1) the existing Distribution Liabilities owed to

Johnny and Timothy and (2) a new liability owed to Johnny arising from his payment of legal

fees on Henley's behalf.  *Id.* at 5.  David filed this action in response, claiming the transfers

2

constitute fraudulent transfer, fraud, and negligent misrepresentation. *Id.* at 6-9. He alleges the liabilities satisfied by these transfers were illegitimate and intended to "loot" Henley Mining of its assets, preventing recovery of his judgment. [R. 6 at 6.] David seeks a preliminary injunction preventing Johnny and Timothy from disposing of the transferred assets and requiring them to identify the location of the assets, account for any disposal of the assets, and escrow funds received from such disposal. [R. 5-1.]

David's motion was styled as a Motion for a Temporary Restraining Order and Preliminary Injunction. [R. 5; R. 6 at 1.] However, the Court found that he was not truly pursuing a TRO and construed the motion as only requesting a preliminary injunction. [R. 8.] After the parties fully briefed the motion, the Court held a preliminary injunction hearing on April 13, 2022. [R. 25.] Alongside his other arguments, David argued for the first time at the hearing that the transfers were not "for value" because they violated Kentucky's Corporations Act. [*See* R. 27 at 1.] The Court granted the parties additional time to brief that issue. [R. 25.] The parties have completed that briefing, so the matter is now ripe for review.

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power ....")). To issue a preliminary injunction, the Court must consider: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4)

3

whether the public interest would be served by issuing the injunction. *Overstreet*, 305 F.3d at

573. These considerations are "factors to be balanced, not prerequisites that must be met." *Six*

*Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997).

## A

David states his Motion for Preliminary Injunction is only based on his fraudulent

transfer claim. [R. 19 at 1.] Therefore, the Court will only consider that claim in determining

whether he is likely to succeed on the merits. As an initial matter, the pleadings were unclear as

to which section of Kentucky's Uniform Voidable Transfer Act supports his claim. The

Complaint cites to KRS § 378A.050 as a whole, though it quotes § 378A.050(1), and the Motion

for Preliminary Injunction only refers to § 378A.050(1). [R. 1 at 6; R. 6 at 4-5.] But in his

Reply, David argues he is likely to succeed on his claim under § 378A.050(2). At the hearing,

the Court asked him which provision he was proceeding under, and he presented arguments as to

both. [*See* Tr. at 4-6.] The Court considered both sections and finds he is unlikely to succeed

under KRS § 378A.050(2), but likely to succeed under (1).

## 1

The Defendants argue that David's fraudulent transfer claim is time-barred if it is being

brought pursuant to KRS § 378A.050(2). [R. 17 at 7-3.] The KUVTA's limitations period states

the claim is extinguished unless it is brought:

> (1) Under KRS 378A.040(1)(a), not later than four (4) years after the transfer was
> made or the obligation was incurred or, if later, not later than one (1) year after
> the transfer or obligation was or could reasonably have been discovered by the
> claimant;
>
> (2) Under KRS 378A.040(1)(b) or 378A.050(1), not later than four (4) years after
> the transfer was made or the obligation was incurred; or
>
> (3) Under KRS 378A.050(2), no later than one (1) year after the transfer was
> made.

4

KRS § 378A.090.  Accordingly, if the claim is under KRS § 378A.050(2), it is subject to a one-year statute of limitations.

**a**

The Defendants argue "the statute makes clear that this one-year limit is a strict time bar and not subject to the discovery rule."  [R. 17 at 8.]  They reach this conclusion by comparing KRS § 378A.090(3) to (1).  Section (1) includes discovery language but (3) does not, so they argue the legislature made a clear choice that the discovery rule only applies to claims brought under KRS § 378A.040(1)(a) (transfers made with actual fraudulent intent).  *Id.*  Under this view, David's claim would have expired on December 15, 2021, one year after the last allegedly fraudulent transfer.  *Id.*  He did not file this action until February 2, 2022.  [R. 1.]

In opposition, David attempts to show the limitations period on his claim began when the transfers were discovered.  [R. 19 at 3-4.]  But all of the cases he cites are applying an analogue of KRS § 378A.090(1), which explicitly includes a discovery rule but does not apply to claims pursuant to KRS § 378A.050(2).  *Id.*; *see, e.g. Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)*, 834 F.3d 651, 672 (6th Cir. 2016).  In fact, one of his cited cases held that an analogue to KRS § 378A.090(2) "provides for extinguishment of an action when the transfer was made, not when it was discovered."  *State Farm Mut. Aut. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 305 (E.D. Penn. 2011).  Like KRS § 378A.090(3), (2) does not include the discovery language that is included in (1), so this case actually supports the Defendants' position that the claim is time-barred.  Many other courts have held that the absence of discovery language in UVTA statutes of limitation prohibits application of the discovery rule.  *See Am. Pegasus SPC v. Clear Skies Holding Co.*, 2015 U.S. Dist. LEXIS 189547, at *75 (N.D. Ga. Sept. 22, 2015) ("there is no discovery rule which would operate to toll the four-year statute of limitations for claims of constructive fraud");

5

*Sw. Holdings, L.L.C. v. Kohlberg & Co. (In re Sw. Supermarkets, L.L.C.)*, 315 B.R. 565, 576

(Bankr. Az. 2004), vacated on other grounds *Collins v. Kohlberg & Co. (In re Sw. Supermarkets,*

*L.L.C.)*, 376 B.R. 281 (Bankr. Az. 2007); *Johnston v. Crook*, 93 S.W.3d 263, 270 (Tex. App.

2002).

Though these cases were interpreting provisions comparable to KRS § 378A.090(2), the

reasoning applies equally to § 378A.090(3).  Because (1) clearly includes a discovery rule, it

follows that by not using that language in (2) and (3), the legislature intended for no discovery

rule to apply.  Accordingly, the one-year statute of limitations for a claim under KRS §

378A.050(2) begins on the date the transfer occurred, not when it was discovered.

### b

At the preliminary injunction hearing, David argued this statute of limitations is subject

to equitable tolling.  [Tr. at 6.]  He pointed to the supplementary provisions of the KUVTA,

which maintain principles of law and equity as applicable to the Act unless displaced by another

provision.  *Id*. at 5; KRS § 378A.120.  He claimed the limitations period should be tolled because

the transferred equipment was never physically moved, so he had no reason to know it was

transferred.  [Tr. at 6.]  In response, the Defendants argued the KUVTA statute of limitations is

not subject to equitable tolling because it extinguishes "not just the remedy but the right,"

making it a statute of repose that cannot be tolled.  *Id.* at 7.

The Defendants are correct that statutes of repose are not subject to equitable tolling.

*Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 786-87 (6th Cir.

2016) (citing *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014)).  Statutes of repose "effect a

legislative judgment that a defendant should be free from liability after the legislatively

determined period of time."  *Id.* (internal quotations and citation omitted).  This is distinct from

statutes of limitations' purpose to encourage efficient prosecution of known claims. *Id.* If the KUVTA's limitations period is a statute of repose, David's request for equitable tolling cannot be granted.

Courts across the country disagree over whether their state's adoption of the UVTA includes a statute of repose or limitation. The North Carolina Court of Appeals concluded that the limitations period in North Carolina's adoption of the UVTA, which is identical to Kentucky's, does function as a statute of repose. *KB Aircraft Acquisition, LLC v. Berry*, 249 N.C. App. 74, 84 (N.C. Ct. App. 2016); *compare* N.C. Gen. Stat. § 39-23.9 *to* KRS § 378A.090; *see also Hoch v. Hoch (In re Hoch)*, 577 B.R. 202 (E.D. N.C. Bankr. 2017). It reasoned that "because § 39-23.9 measures the time period in relation to an event separate from the realization of an injury by the claimant, the statute is one of repose." *Id.* at 85. The statute, like Kentucky's, states a claim "is extinguished" within certain time periods after the event itself. *Id.* The court found that use of "extinguished" eliminated the claim itself, "as opposed to merely barring a remedy." *Id.* The same result was apparently reached in New Jersey.[1] *Passaic Arms Condo. Ass'n v. Felbee Realty*, 2021 N.J. Super. Unpub. LEXIS 3178, at *25 n.3 (N.J. Super. Ct. App. Div. Dec. 29, 2021).

The opposite result was reached in Georgia. *Post-Confirmation Comm. For Small Loans, Inc. v. Martin*, 1:13-cv-195, 2016 U.S. Dist. LEXIS 43974, at *22 (M.D. Ga. Mar. 31, 2016). That court found the voidable transfer limitation period did not include similarly prohibitive language as other Georgia statutes of repose, state and federal courts had treated it as a statute of limitation, and the Georgia legislature's intent seemed to be that the statute be one of limitation.

---

[1] In deciding whether a different statute constituted a statute of repose, the court stated "PREDFDA also does not share the same language as other New Jersey statutes that we have said are clearly statutes of repose, such as N.J.S.A. 25:2 - 31, for extinguishment of a claim for relief under the Uniform Voidable Transactions Act." However, the court did not cite the decision reaching that conclusion and the Court has not been able to access it.

*Id.* at \*19-22.  In yet another interpretation, the Colorado Supreme Court recognized that the Uniform Fraudulent Transfer Act's extinguishment language, which is nearly identical to the UVTA and Kentucky's adoption of it, suggests it could be *both* a statute of limitation and a statute of repose.  *Lewis v. Taylor*, 375 P.3d 1205, 1209 (Co. 2016).

The Court finds it is inappropriate to determine this matter of unclear state law because there is such uncertainty across the country on this issue, the parties have not had an opportunity to fully brief the issue, and resolution is unnecessary.  Below, the Court explains that David is likely to succeed on his fraudulent transfer claim under KRS § 378A.050(2).  He only needs to be likely to succeed on one claim to satisfy this first element of the preliminary injunction analysis.  Therefore, the Court will refrain from ruling on this complicated issue until it is necessary to do so and the parties have an opportunity to address it beyond brief arguments in a hearing.

### 2

In contrast, David is likely to succeed on his claim under KRS § 378A.050(1).  As an initial matter, such a claim would not be time-barred.  KRS § 378A.050(1) is subject to a four-year statute of limitations beginning on the date the transfer occurred.  KRS § 378A.090(2).  The last transfer occurred on December 15, 2020, so a February 2, 2022 claim is timely.

[R. 1-5.]

KRS § 378A.050(1) provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

To be successful on a claim under this provision, David must be able to show that: (1) his claim

arose before the transfer was made, (2) Henley did not receive a reasonably equivalent value in exchange for the transfer, and (3) Henley was insolvent or became insolvent because of the transfer.

### a

The parties do not present arguments over whether David's claim arose before the transfer occurred.  He summarily stated his claim arose "at least as early as January 31, 2017." [R. 6 at 5.]  The Defendant does not mention this element.  The statute defines a "claim" as a "right to payment, whether or not the right is reduced to judgment."  KRS § 378A.010(3).  David is therefore correct, because his "right to payment" of one third of the value of the companies arose on January 31, 2017, the day Johnny and Timothy conducted a "squeeze-out" merger.  [R. 6 at 6.]

### b

The primary disagreement in this matter is whether the Defendants received a reasonably equivalent value in exchange for the transferred equipment.  All of the transfers were in satisfaction of liabilities owed by Henley Mining to Johnny and Timothy.  [See R. 7-3; 7-4; 7-5; 7-6.]  The KUVTA specifically states that satisfaction of an antecedent debt constitutes value, so the issue is focused on whether the value of the satisfied debt was reasonably equivalent to the value of the transferred equipment.  KRS § 378A.030(1).

Some transfers satisfied a Legal Liability Payable owed to Johnny Parton.  Johnny paid a total of $223,845.69 in legal fees incurred by Henley Mining, which the company recorded as a debt it owed Johnny.  This liability was satisfied in its entirety.  [R. 7-5 at 5.]  The remaining transfers applied to the Distribution Payable Liabilities owed to Johnny and Timothy.  These debts arose from the companies' sale of equipment to David, which necessitated an equal

distribution to Johnny and Timothy because the companies they owned with David were structured as S-corporations.  [R. 1-8 at 6.]  Rather than taking those distributions in cash at the time, the Defendants recorded them as Distribution Payable Liabilities on Henley Mining's books for $445,762.50 each.  [R. 17 at 5.]  Henley transferred a total of $378,831.31 in assets to Johnny in satisfaction of his Distribution Payable Liability.  $101,686.43 remains due.  [R. 7-6 at 5.]  Henley also transferred a total of $364,000 to Timothy in satisfaction of the Distribution Payable Liability owed to him.  $81,787.50 remains due.[2]  [R 7-6 at 7.]

### i

On their face, these transfers appear to be above-board satisfactions of debts owed by Henley to its owners, Johnny and Timothy.  But the transfers are complicated by value determinations this Court made in *Henley Mining v. Parton*.  The Court found the Distribution Payable Liabilities are worth $232,500 each, not $445,762.50.  [R. 1-8 at 9.]  It also determined the value of the companies' assets as of the date of the merger, which was less than David's valuation but greater than Johnny and Timothy's.  [*See* R. 1-8 at 9-13.]  Now, the Court must determine the value of the liabilities and the transferred equipment as of the date of the *transfer*, then compare those values to find whether they were reasonably equivalent.  *See Valley City Steel, LLC v. Liverpool Coil Processing, Inc.*, 336 Fed. App'x 531, 534 (6th Cir. 2009).

Regarding the value of the liabilities, David argues the transfers "were made in complete disregard of the valuation issue that was actually tried and decided by this Court."  [R. 19 at 5.]  He asserts the Defendants "did nothing to comply with [the Court's] decision" about the true value of the distribution.  *Id.*  In response, the Defendants state they were entitled to rely on the value of the Distribution Payable Liabilities on Henley Mining's books at the time they made the

---

[2] These amounts reflect the Defendants' valuation of the transferred equipment and debt owed.

10

transfers.  [R. 17 at 11.]  They argue the transfers were "made in good faith and defended at trial," so they should not be punished for the Court's subsequent determination that the debt was worth less than they initially believed.  *Id.*

Satisfaction of an antecedent debt qualifies as value given.  KRS §378A.030(1).  The value of the debt must be determined as of the time of the transfer.[3]  *Valley City*, 336 Fed. App'x at 534.  The Court's ruling that the liabilities are worth $565,000 was issued in 2020, but it determined the value of the distributions as of the date they arose in 2015.  Though the Defendants believed the liabilities were worth more at the time of the transfers and recorded them on their books at that higher value, that belief proved to be incorrect.  The Court found Johnny and Timothy were only ever owed $282,500 each; there is no more debt the company could have satisfied.  Any transfer in excess of the amount the company actually owed its owners would not have been in satisfaction of a debt because no more debt existed.  In contrast, the Court has no reason to believe the legal liability owed to Johnny is worth any more or less than the amount proffered by the Defendants of $223,845.69.  [R. 17 at 4-5.]  The maximum amount of debt Henley could have satisfied by transferring assets to Johnny and Timothy is $788,845.69.[4]

It appears likely that Henley Mining transferred equipment to Johnny and Timothy far in excess of the amount of debt it actually owed them.  Again, the value of the transferred

___

[3] *Valley City* specifically states: "we have ruled that a 'reasonably equivalent value' must be evaluated based on the *facts known* at the time of the transaction."  336 Fed. App'x at 534 (citing *In re Chomakos*, 69 F.3d 769, 770-71 (6th Cir. 1995) (emphasis added)).  Though the court used the term "facts known," it does not appear "value" is dependent on the transferor's knowledge or understanding of the value at the time.  *Chomakos* actually determined the objective value of the transferred property, rather than relying on the facts known to the transferor at the time, and that case does not use the term "facts known" at any point.  69 F.3d at 770-72.  In cases subsequent to *Valley City*, the inquiry has focused on actual value.  *See United States v. Key*, 837 Fed. App'x 348, 353 (6th Cir. 2020).  The Court will approximate the equipment's actual, not believed value, as of the date of the transfer.
[4] This total debt reflects the Legal Liability Payable of $223,845.69 plus the Court's $565,000 valuation of the Distribution Liability Payables.

equipment is determined as of the date it was transferred.  *Valley City*, 336 Fed. App'x at 534.  It is not appropriate for the Court to definitively determine this value at the preliminary injunction stage.  Rather, it must ask whether David is likely to successfully show that the equipment was not transferred in exchange for a reasonably equivalent value.  *Overstreet*, 305 F.3d at 573.  The Court finds he is.

The Defendants' valuation of certain pieces of equipment it transferred is significantly less than the Court's determination of the value of that same equipment just three years prior. For example, one of the assets transferred to Timothy on November 9, 2020, in satisfaction of his Distribution Payable Liability, was a Joy JM 12/12 Continuous Miner.  [R. 1-3 at 4.]  The Court previously determined that as of January 31, 2017, this miner was worth $180,000.  [R. 11-8 at 10-11.]  However, the distribution sheet values this miner at only $22,500.  [R. 7-4 at 5.]  This means Henley received just $22,500 in satisfied debt in exchange for a miner that was worth $180,000 just three years prior.  Similarly, the Court determined three shuttle cars were worth $23,400 each in 2017.  [R. 1-8 at 11.]  The distribution sheets identify eight transferred shuttle cars, the most valuable of which was listed at $8,000.  [R. 1-3 at 3-4; R. 1-5 at 5, 7.]  Finally, a 14/15 miner was transferred and valued at just $25,000, in contrast to the Court's determination that it was worth $175,000 three years earlier.[5]  Though it is likely the equipment depreciated from early 2017 to late 2020, it is highly unlikely the depreciation was that significant.

This inference is bolstered by the drastically different estimations of the equipment's value that the parties presented at the hearing.  This was true in the prior case as well and the Court's resolution tended to be in the middle of the proffered values.  [*See generally* R. 1-8.]

---

[5] This miner was referred to as a "15/15" miner in the distribution records.  [R. 7-4 at 4.]  At the hearing, the Defendants confirmed this is actually the 14/15 miner that was evaluated in the prior case.  [Tr. at 20; R. 1-8 at 10-11.]

The same is likely true here.  At the hearing, the Court asked the parties about the value of the 12/12 miner discussed above.  The Defendants clarified that their valuation of the transferred equipment was based on an appraisal conducted in September 2020, which valued the 12/12 at $22,500.  *Id.* at 16.  In response, David testified that the miner was worth approximately $250,000-275,000 at the time of the transfer.  *Id.* at 71.  Compare those disparate values to the Court's determination that it was worth $175,000 in 2017.  [R. 1-8 at 10-11.]  Applying the eight percent yearly depreciation rate the Court used for other mining equipment, the 14/15 would be worth approximately $148,000 in 2020.  [*See* R. 1-8 at 9.]  Therefore, it is likely that the actual value is close to the median of the parties' proffered valuations, significantly greater than the Defendants' valuation and the amount of satisfied debt Henley received.

A more holistic review of Henley's transferred and remaining assets also supports a conclusion that the transfers were not for value.  Overall, the Defendants valued the total distributed assets at $931,896.69.  [R. 17 at 12.]  Henley's only assets remaining after the transfers to Johnny and Timothy are the escrowed funds and Tennessee property, which is worth approximately $450,000.  *Id.*  However, the Court determined the company's assets were worth a total of $3,883,980 in 2017.  [R. 1-8 at 15.]  For the Defendants to have accurately valued the transferred assets, the company would had to have lost over fifty percent of its value in three and a half years.  Given the Court's prior use of an eight percent yearly depreciation rate for coal mining equipment, which constituted almost all of Henley's value, this is highly unlikely.  *See id.* at 9.  Accordingly, David will likely be able to successfully show the actual value of the transferred equipment exceeded the amount of satisfied debt.

**ii**

David claimed for the first time at the preliminary injunction hearing that the

distributions could not be "for value" because they were in violation of Kentucky's Corporation Act. [R. 27 at 1-2.] The Court allowed the parties to brief the issue and in response, the Defendants contend the transfers do not qualify as "distributions" because they were not based on Johnny and Timothy's status as shareholders in the companies. [R. 28 at 2.] The Court has determined that Henley did not receive a reasonably equivalent value in exchange for the transferred equipment. David does not need to prove another ground for his assertion that the transfers were not for value. Therefore, resolution of this issue is unnecessary.

### c

The parties also disagree whether Henley Mining was insolvent at the time of the transfers or became insolvent because of them. "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." KRS § 378A.020(1). David cites, and brought this action because of, a settlement offer made by the Defendants. In that offer, counsel for the Defendants stated Henley "distributed the majority of its assets to Johnny and Tim" and that "except for *de minimis* items, the current assets of the company consist solely of (i) the escrowed funds . . . and (ii) the Tazewell, Tennessee real estate." [R. 7-7 at 2.] The funds are worth "approximately $300,000" and the property "approximately $150,000." [R. 17 at 12.] The Defendants claim that before the transfers, Henley owned those assets in addition to the distributed equipment, all of which was worth a total of approximately $1,400,000. *Id.* at 13. Therefore, they suggest that Henley had sufficient assets to satisfy David's judgment. This framing is incorrect because it merely tallies assets without considering debts. After the transfers, the company only owned around $450,000 in cash and property. This is insufficient to satisfy David's nearly $1,000,000 judgment, so the transfers made Henley Mining's debts greater than its assets. Therefore, Henley became insolvent because of the

transfers.

David is likely to be successful on his fraudulent transfer claim brought under KRS § 378A.050(1).  It appears he will be able to show (1) his claim arose before the transfer, (2) Henley Mining did not receive a reasonably equivalent value in exchange for the transferred assets, and (3) Henley Mining became insolvent as a result of the transfers.  Therefore, this factor weighs in David's favor.

**B**

David must also show he would suffer irreparable injury if the Court does not issue a preliminary injunction.  The injury must be "certain and immediate, not speculative or theoretical."  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (*citing Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).  David alleges he will suffer irreparable injury if the Defendants are able to "loot Henley Mining of its assets" because he will not be able to collect on his judgment.  [R. 6 at 6.]  The Defendants argue that the potential injury David faces is not irreparable because it is for a set amount that is compensable by money damages.  [R. 17 at 13.]  They also argue he has other adequate remedies, namely attachment and writ of possession.  *Id.*

Analysis of this element is awkward because a movant typically requests injunctive relief protecting a *potential* judgment in his favor, not a judgment that is already in hand.  But another Eastern District court faced this circumstance and found it had the authority to enter a post-judgment preliminary injunction freezing assets under the court's general authority to issue "necessary injunctive relief 'in aid of its jurisdiction.'"  *West Hill Farms, LLC v. ClassicStar, LLC*, 06-cv-243-JMH, 2013 U.S. Dist. LEXIS 119813 at *8 (E.D. Ky. Aug. 13, 2013).  The Court agrees and finds that the fact that this action is brought post-judgment does not preclude

issuing a preliminary injunction.

A party's inability to collect a money judgment is usually not considered irreparable harm. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). But *Grupo* "specifically reserved the question of whether an injunction to preserve a legal remedy would be appropriate in cases where the defendants have engaged in fraudulent behavior." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 628 (6th Cir. 2013). In resolving that reserved question, the Sixth Circuit joined many other circuits and recognized an exception to *Grupo* allowing asset-freeze preliminary injunctions in cases involving fraudulent conveyances. *Id.*

Henley itself informed David that it is currently unable to satisfy his judgment against it. [R. 1-6.] He will suffer harm if Johnny and Timothy are allowed to transfer the assets they appear to have wrongfully obtained because those assets are necessary for him to satisfy his judgment in full. The Court has found that David is likely to succeed on his fraudulent conveyance claim, so the exception in *Williamson* is implicated and his inability to collect an existing money judgment justifies an asset-freeze preliminary injunction.

As part of this element, a movant must also establish that there is no other adequate remedy at law. *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002). The Defendants argue that David has adequate remedies under Kentucky law of attachment and a writ of possession, which he raised in his complaint. [R. 17 at 13.] David does not address this issue. [*See* R. 6; R. 19.]

Neither attachment nor a writ of possession would be an adequate remedy. David is seeking to prevent the sale of assets he claims are necessary to secure his judgment while the Court determines whether they were fraudulently transferred. Those remedies require the

16

movant show he is entitled to possession of the assets or the existence of a fraudulent transfer. *See* KRS § 425.011(2)(a), KRS § 425.301(1)(g).  Such determinations are the heart of this litigation, so David will not be able to obtain them until this matter is fully resolved. Accordingly, neither would provide an adequate remedy for his current concern that the Defendants will dispose of the assets and eliminate his opportunity to enforce his existing judgment *before* the Court determines whether they were lawfully transferred.  David will be unable to collect an existing judgment and has no other adequate remedy, so he faces irreparable injury in the absence of a preliminary injunction.  This factor also weighs in his favor.

## C

Next, the Court must weigh the harm David would suffer from denial of the injunction against the harm the Defendants would suffer if the injunction is granted.  *Brock v. Bell Cnty. Volunteer Fire Dep't, Inc.*, 10-162-GFVT, 2013 U.S. Dist. LEXIS 28557, at *9 (E.D. Ky. Mar. 1, 2013).  The Court additionally looks to potential harm to third parties.  *Id.*  David attempts to argue this element only considers harm to third parties and that no third parties that would be harmed by granting this injunction.  [R. 6 at 7.]  It is true that there are no third parties involved, but the Court clearly weighs the harms posed to David and Defendants.  *See Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (applying the balance of harms test).

The Defendants will face some harm if they are unable to dispose of their assets.  They explained in the preliminary injunction hearing that they have a contract to begin mining and would like to transfer the equipment to a new LLC.  [Tr. at 61, 85.]  But if enjoined, they would be able to use their equipment and would only be prevented from transferring it to a new entity. On the other hand, David will face substantial harm if he is unable to collect the nearly $1,000,000 judgment he has in hand.  He is concerned that if the equipment is transferred again,

it would be extraordinarily difficult to claw it back if he is successful on his fraudulent transfer claim. *Id.* at 86-87. As the Court previously established, he can likely show Johnny and Timothy were fraudulently transferred the assets in their possession. Accordingly, their interest in disposing of those assets is significantly diminished. This element also weighs in David's favor.

### D

Finally, David asserts that it is in the public interest to protect minority shareholders by preventing majority shareholders from looting assets and rendering a judgment against them moot. [R. 6 at 7.] The Defendants claim that the injunction would go against public policy by "effectively grant[ing] a dissenter super-priority over other creditors and a veto power over the use of company assets." [R. 17 at 15.] Because David has a judgment in his favor, protecting this judgment is in the public interest. *State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Phys. Therapy, Inc.*, 376 Fed. App'x 182, 184 (3d Cir. 2010). Further, because the Court found he is likely to succeed on his fraudulent transfer claim, the general public interest against fraud is also implicated. *See, e.g. Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020). Given that it seems Johnny and Timothy fraudulently obtained the assets in question and the significant interest David has in collecting his judgment, this factor weighs in his favor.

### E

In the event a preliminary injunction is issued, the Defendants ask the Court to require David to provide a bond under FRCP 65(c). [R. 17 at 15.] The Rule uses mandatory language, but the Sixth Circuit has found the Court actually has broad discretion over whether to require a bond and if so, the amount. *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013). The strength of the movant's case and the public interest

18

involved can weigh against requiring a bond.  *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

The Defendants do not state the expected financial impact of an injunction; rather, they request a bond of double the value of the property because that is the amount the Kentucky attachment and writ of possession statutes require.  [R. 17 at 15-16.]  They do not provide support for why those statutes should govern the bond issued in this matter.  Typically, "a party seeking a security bond . . . estimates the damages it will suffer if it complies with a preliminary injunction."  *Coventry*, 714 F.3d at 432.  One purpose of this common practice is to "provide the court with a basis to set the proper amount."  *Id.*  Such information is helpful because Rule 65 states a bond should be "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).

The Defendants did not provide an estimation of the damages they will suffer if the injunction is granted.  The only harm they stated would befall them if enjoined is their inability to transfer equipment to new LLCs before beginning to mine again.  *Id.* at 85.  Without any specific examples of financial harm the injunction will impose on the Defendants, the Court finds that they will suffer minimal damages from being enjoined given the limits of the injunction.  David does not request the Defendants be enjoined from using the equipment, only that they cannot dispose of it.  [R. 5.]  Accordingly, the Defendants can take advantage of mining opportunities if the equipment remains under Johnny and Timothy's ownership.  The Court finds a bond is not necessary in this matter.  *See HBA Motors, LLC v. Brigante*, 1:21-cv-624, 2021 U.S. Dist. LEXIS 193641 (S.D. Ohio Oct. 7, 2021) (not imposing a bond in an asset-freeze temporary restraining order to involving fraudulent conveyances).

19

**F**

Finally, the Court must specify the scope of the injunction.  At the preliminary injunction hearing, the Defendants argued that an injunction against all of their assets would be overbroad because some of the transferred assets did not make Henley insolvent.  [Tr. at 88.]  Put more simply, David is only entitled to protect assets necessary to protect his judgment.  The Court agrees and will limit the injunction to only apply to assets necessary to secure the $957,517.67 judgment.  Accordingly, the Defendants will be enjoined from disposing of $957,517.67 worth of assets.  Rather than the Court reviewing the assets and determining on its own which are sufficient to protect the judgment, the Court will direct the parties to confer and file an agreed list of assets which the Defendants will not sell.  If the parties cannot come to an agreement, the matter will be referred to a Magistrate Judge for assistance.

David also asked for various accounting requirements to be imposed on the Defendants, such as identifying the location of the assets and accounting for any sold assets.  [R. 5-1 at 3.]  The Defendants confirmed that, other than a 2016 Peterbilt truck which was distributed to and sold by Johnny, all of the equipment is currently located at the Arjay Schoolhouse and has not been sold.  [R. 1-2 at 3; R. 1-5 at 2-3; Tr. at 84.]  Therefore, David's request to require an accounting of this information is moot.

**III**

The Court finds each preliminary injunction factor weighs in David's favor.  Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Plaintiff's Motion for Preliminary Injunction **[R. 5]** is **GRANTED**;

2. The Defendants are **ENJOINED** from selling or otherwise disposing of assets in an amount necessary to protect the Plaintiff's $957,517.67 judgment;

20

3.  The parties are **DIRECTED** to confer and file an agreed list of assets sufficient to satisfy the Plaintiff's judgment within **thirty (30) days** following the entry of this order, and;

4.  The Clerk is **DIRECTED** to file a copy of the Transcript of the Preliminary Injunction Hearing into the record.

This the 23d day of June, 2022.

Gregory F. Van Tatenhove
United States District Judge